Matthew Abbasi, Esq.
California State Bar No. 215030
*Pro Hac Vice Approved*
**ABBASI LAW CORPORATION**
8889 West Olympic Blvd., Suite 240
Beverly Hills, California 90211
Telephone: (310) 358-9341
Facsimile: (888) 709-5448
Matthew@malawgroup.com

*Attorneys for the Debtor*

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
**SCHWARTZ FLANSBURG, PLLC**
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741

*Local Counsel for the Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA, LAS VEGAS DIVISION**

| | |
|---|---|
| In re:<br><br>STONERIDGE PARKWAY, LLC<br><br>Debtor and Debtor in Possession. | **Case No.: 16-11627-BTB**<br><br>**Chapter 11 Proceeding**<br><br>**HON. BRUCE T. BEESLEY**<br><br>**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER: (A) AUTHORIZING DEBTORS AND DEBTORS-IN-POSSESSION TO OBTAIN SECURED DEBTOR-IN-POSSESSION FINANCING; (B) APPROVING AGREEMENTS RELATING TO THE FOREGOING; AND (C) GRANTING RELATED RELIEF**<br><br>**Hearing:**<br><br>DATE: TBD<br>TIME: TBD<br>PLACE: TBD |

**TO THE HONORABLE BRUCE T. BEESLEY, UNITED STATES BANKRUPTCY JUDGE:**

STONERIDGE PARKWAY, LLC, a California limited liability company, the debtor and debtor-in-possession in the above-captioned chapter 11 cases (the "*Debtor*"), hereby files this Motion (the "*Motion*") pursuant to §§ 364(c)(1) and (3) of title 11 of the United States Code, 11 U.S.C. §§ 101-*et seq.* (as amended, the "*Bankruptcy Code*") and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") for entry of a final order:

(a) authorizing the Debtor to obtain, on a final basis, debtor-in-possession financing (the "*DIP Financing*" or "*DIP Loan*") in the amount of up to $250,000.00 on the terms set forth in this Motion.

(b) securing all obligations owed in respect of the DIP Financing with (i) a perfected, fully enforceable and non-avoidable lien (the "*DIP Lien*") upon all assets previously encumbered as of the Petition Date (as defined below) pursuant to § 364(c)(3) of the Bankruptcy Code, subject only to the "Carve-Out" identified below and all liens, security interests or charges against or interests in the Debtor's assets that arose on or before the Petition Date to secure the payment of a debt or performance of an obligation, including any liens on such assets arising prior to the Petition Date in favor of the secured lender (as defined below), all post-petition accruals thereon, and all government claims which are senior in priority to existing secured claims whether incurred prior or subsequent to the Petition Date (the "*Permitted Encumbrances*") and (ii) a super priority claim (the "*Superpriority Claim*") in the Debtor's bankruptcy case in the amount of any outstanding principal, interest and fees in respect of the DIP Financing having priority over all administrative expenses of the kind specified in §105, §326, §328, §330, §331, §503(b), §506(c), §507(a), §507(b), §546(c) and §726 of the Bankruptcy Code, subject only to the Carve-Out;

(c) approving the terms of an Debtor-in-Possession Credit Agreement (the "*Agreement*"), note and other related documents (collectively with the Agreement, the "*Loan Documents*") evidencing the DIP Financing, including, without limitation, the accrual of interest at 6% per annum, payable only in kind. The Loan Documents will be filed with the Court by **June 30, 2016.**

(d) authorizing the execution and performance of the Loan Documents; and

(e) granting related relief.

In support of this Motion, the Debtor relies upon the Declaration of Danny Modab and Exhibits thereto ("Modab Declaration") in Support of this Motion and respectfully represent as follows:

**I.**

**INTRODUCTION**

Stoneridge Parkway, LLC, a California Limited Liability Company (the "Debtor"), is the Debtor and the Debtor-In-Possession ("DIP") in this Chapter 11 case. The Debtor is a California Limited Liability Company with its headquarters located in Reseda, California. The Debtor filed its Emergency Voluntary Petition for Reorganization under Chapter 11 of the Title 11 of the United States Code on **December 18, 2015** ("Petition Date").

**On December 16, 2015,** the Debtor acquired the real property formerly known as the "Silverstone Ranch Community Golf Course" located at 8600 Cupp Drive, Las Vegas, NV 89131-1658 (hereinafter the "Property") from the prior owner, Desert Lifestyles, LLC ("DLS"). The Property was formerly a 27-Hole Golf Course but the course has not been in operation since at least September 1, 2015.

The Silverstone Ranch Community Association (the "HOA") has a "Second Amended and Restated Reciprocal Easement Agreement and Covenant to Share Costs" (the "Golf Course Agreement") recorded on the title of the Property. As per this Agreement with the HOA, the Property can only be used to operate a 27-Hole golf course, irrespective of the costs, limited use of the Property by the surrounding community, and the scarcity of water due to the ongoing water crisis in the Southwestern United States.

The Debtor acquired the Property from DLS "as-is" based on a confidential Purchase and Sales Agreement ("PSA"). However, the Debtor never assumed any of DLS' liabilities and the Debtor is not a successor-in-interest or an affiliate or alter-ego of DLS.  The Debtor is responsible for satisfying the secured debt and maintenance of the property.

Western Golf Properties ("WGP") is the Debtor's Property Manager. WGP was also the Manager of the Property when the Property was owned by DLS. As per the PSA, the

**3**

management agreement between WGP and DLS was assigned to the Debtor. Since the acquisition of the Property, WGP has been watering, and maintaining the Property. However, due to a lack of funding, the watering and maintenance ceased on or about May 13, 2016. As it stands, WGP requires additional monies to pay for utilities, employees, and other costs. As part of its Plan, the Debtor shall seek approval of a new management agreement with WGP after securing DIP financing (discussed herein).

The Debtor has one major creditor which is Aevitas Capital, LLC ("Aevitas"). As listed in Debtor's Petition, the Debtor owes **$6,020,874.63** to Aevitas, which is secured by the Property. As further listed in Debtor's Petition, the Debtor has various tools, machines, plants, restaurant equipment, bar equipment, office furniture, office equipment, and other personal property which are kept at the Property and worth approximately **$120,000.00**. Moreover, it is the Debtor's position it owns the rights, title and interest in a **$340,000.00** water deposit held in the name of or by the Manager of the Property, WGP.

On **June 2, 2016**, the Debtor filed its Disclosure Statement and its Plan of Reorganization (the "Plan"). In essence, the Debtor's Plan provides for the Debtor to reorganize by liquidating and selling assets of the Estate (personal property); entering into a Forbearance Agreement with the Debtor's secured lender and obtaining DIP financing; and by either: (a) rejecting the Golf Course Agreement which severely limits the use of the Debtor's main asset to a 27-Hole golf course as an executory contract, (b) stripping off the use restrictions as an unwarranted alienation of the property, or (c) selling the property free and clear of all encumbrances, any of which will allow for the re-entitlement of the Property and allow the Debtor to make the highest and best economical use of the Property.

As explained in the Debtor's Disclosure Statement and Plan, due to its high water costs, inefficient layout, lack of local use, overtly large clubhouse, and fringe location, this Property has historically generated very substantial net operating losses, recently totaling nearly $1 million per year. In fact, no operator has been able to break even in the past decade because of the costs. As such, for the past decade no operator of the Property has been able to operate a golf course without a subsidy from the owner. Unfortunately, the water crises in Las Vegas will only get worse

**4**

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

in the years to come. Therefore, unless a reduction in the water rates can be obtained, the Property cannot be reopened profitably as a 27-Hole Golf Course under any management, which is why this Property has been unprofitable for the past decade. Further, even with reduced water rates, the Property will require a significant amount of money to renovate/repair the Property. Additional monies will also be needed to buy new golf carts, buy new machines, hire staff, and to market the course.

In sum, the Property cannot cover the cost of its operations as a Golf Course based on the demands imposed by the Golf Course Agreement and the HOA. However, a re-entitlement of the Property to allow for its best economical use will not only pay all outstanding claims but it will also cause the value of the surrounding properties to increase.

## II.

## DEBTOR'S PLAN

Debtor's Plan is to re-entitle the entire property for residential housing as this is the best use of the Property. There are approximately 270 acres of land that can be re-entitled at the Property. If green buffer zones are provided to protect the view corridor of the existing homes, over 220 acres of net developable acreage would be available to be used. *See **Exhibit "B"** to the Declaration of Anthony O. Righellis.* The new development can also include recreational facilities and open space for the use of entire community.

**A.    DEBTOR'S PLAN:**

In order to effectuate the Debtor's Plan, the Golf Course Agreement currently burdening the Property must be amended or removed to allow a re-entitlement of the Property. Thereafter, the following will occur:

1. The re-entitled land will be sold in whole, or in part, to others to develop the Property which will provide funds exceeding the amount owed to all creditors;
2. The first proceeds from the sale will go first the Aevitas to repay principal and interest;
3. The remaining balance of the proceeds will go to pay any determined and allowed claims;
4. The next balance of any proceeds shall go to pay off any other creditors of the Estate, including Administrative claims; and

**5**

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

5. If any proceeds are remaining, they shall go to the Debtor.

**B.     MEANS OF EFFECTUATING THE PLAN**

The Debtor's Plan is to be funded as follows:

(a)    Debtor shall contribute $25,000.00 of new cash to be used for the sole purpose of actual nuisance (e.g. weed abatement), not any maintenance that is aesthetic related (e.g. preservation of the prior golf course);

(b)    Aevitas shall contribute $25,000.00 of new cash to be used for the sole purpose of actual nuisance (e.g. weed abatement), not any maintenance that is aesthetic related (e.g. preservation of the prior golf course);

(c)    Aevitas shall contribute $13,387.74 of new cash to be used to obtain additional insurance for all risk insurance for the property;

(d)    Aevitas agrees to fund an additional $100,000.00 of loan proceeds to be used for the sole purpose of re-entitlement costs at its sole discretion;

(e)    Aevitas agreed to fund up to $100,000.00 for administration fees and costs needed to effectuate the Debtor's Plan;

(f)    Aevitas shall allow the assumption of its loan by the Debtor and agrees to extend the loan maturity to August 31, 2017, and shall lower the interest rate from June 1, 2016 to August 31, 2017 from 18.00 % to 12.00% and change the compounding of interest from daily to yearly;

(g)    Aevitas shall pay all outstanding Property taxes along with all required insurance for the Property and add it to the loan balance;

(h)    Debtor shall work with Aevitas to process the re-entitlement of the Property for no additional compensation; and

(i)    Aevitas agrees to provide a one (1) year extension of the loan from August 31, 2017, if it deems that the re-entitlement process is proceeding appropriately.

Overall, the Debtor's Property is worth more than all the claims against the Estate, but such value can only be realized if the Golf Course Agreement is amended or stripped from the Debtor's Property. Otherwise, the Property has little value to any investor or owner that wishes to

operate a business.

In sum, the Debtor's Plan, if fully implemented, will allow the Debtor to fully pay all Creditors in less than twenty-four (24) months, and will allow the Debtor to sell the Property to a new entity (Buyer/Developer) for profit.

### III.

### PROPOSED DIP FINANCING

As set forth in the Budget and subject to court approval, the Debtor intends to use up to approximately $250,000.00 in DIP Financing proceeds to fund administration, maintenance, insurance costs, and other restructuring costs, including professional fees.

A.  Terms:

The Debtor has entered into an agreement to receive debtor-in-possession financing from Aevitas (the "Lender"). As explained before, the Lender is the Debtor's primary secured creditor. The terms of the DIP Financing are extremely favorable and could not be obtained from any other source. Importantly, the Lender will only charge 6% interest, which is well below the interest rates being charged by other debtor-in-possession lenders. Further, the Lender is prepared to permit the Debtor to pay interest in kind, which preserves cash for operating purposes.

In addition, the Lender the DIP lender is not seeking liens on the Debtor's unencumbered personal property or to prime any liens existing as of the Petition Date. As a result, the DIP Loan will be senior to Aevitas current secured loan. Second, the DIP Lender has agreed that its superpriority claim will be junior to any administrative claims, including under section 507(b) of the Bankruptcy Code. For these reasons, it should be self-evident that the Debtor could not obtain similar financing from any other source.

A.  DIP Financing:

In this instance, the proposed DIP Financing will contain the following pertinent terms which shall set forth the important aspects of the DIP Financing:

BORROWER: STONERIDGE PARKWAY, LLC (the "Debtor")

LENDER: AEVITAS CAPITAL, LLC (the "Lender")

FACILITY: A line of credit in an amount not to exceed $250,000.00.

**7**

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

MATURITY DATE: The maturity date will be the earliest of (a) August 17, 2017; (b) the date of termination of the Lender's obligation to make payment resulting from an "Event of Default"; and (c) the Effective Date of a confirmed chapter 11 plan with respect to the Debtor.

CARVE-OUT: The "Carve-Out" is defined to mean the claims of the following parties for the following amounts: (a) the allowed unpaid fees and expenses payable under §328, §330 and §331 of the Bankruptcy Code to professional persons retained pursuant to orders of the Bankruptcy Court by the Debtor in the Case; and (b) payment of fees pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court in an aggregate amount for clauses (a) and (b) not to exceed $100,000.

USE OF PROCEEDS: The Debtors will utilize the proceeds of the Direct Loans solely in accordance with the Budget. *See **Exhibits A, B and C** to the Declaration of Danny Modab.*

INTEREST: The Debtors will pay interest to the Lender at a rate of 6% per annum, with said interest to be paid in kind and the compounding of interest shall be changed from daily to yearly;

SECURITY: The obligations of the Debtor pursuant to the Loan Documents shall be secured by the DIP Lien and the Superpriority Claim;

EVENTS OF DEFAULT: The occurrence of any one or more of the following events shall constitute an Event of Default: (a) the Debtor breaches a material provision of the Agreement and such breach is not cured within Ten (10) days; (b) appointment of a Chapter 11 Trustee or the conversion of this case to a Chapter 7; (c) appointment of a responsible officer or examiner with respect to the Debtor; or (d) the rights of the Lender in and to the Collateral are impaired by the City of Las Vegas or any other governmental entity.

SECURED LENDERS. The Lender shall not be entitled to be paid interest or principal in respect of the DIP Loan or to exercise any remedies as a result of an Event of Default (other than terminating the commitment under the Loan Documents) until such time as the Secured Lenders have been paid in full; provided, that the DIP Loans may be converted to equity in the context of a plan of reorganization.

///

## IV.

## ARGUMENT

### 1. The Facts And Circumstances Of The Debtors' Bankruptcy Cases Necessitates That The Debtors' Proposed Debtor-In-Possession Financing Be Approved

Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)).

Further, §364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession. See In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 145 B.R. 312 (9th Cir. B.A.P. 1992). Bankruptcy courts have the power to authorize secured postpetition financing under §364(c) of the Bankruptcy Code, which provides, in pertinent part, as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under §503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

(1) with priority over any or all administrative expenses of the kind specified in §503(b) or

**9**

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

§507(b) of this title;

    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

"Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.' " Defender Drug Stores, 126 B.R. at 81 (quoting Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 603 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988)). The incentives enumerated in §364 are not intended to be an exhaustive list of the inducements that a court may grant. Id. In fact, it is not uncommon for a court to approve a lending arrangement containing terms that far exceed those authorized by §364. Id.

Generally, courts apply a three-part test to determine whether a debtor in possession may obtain credit under §364(c) of the Bankruptcy Code. Under such test, the Debtors may incur postpetition financing under the DIP Loan pursuant to §364(c) if they demonstrate that (a) they cannot obtain unsecured credit without superpriority status, (b) the DIP Loan is necessary to preserve the assets of their estates, and (c) the terms of the financing are fair, reasonable and adequate given the circumstances of the debtor and the lender. See In re Crouse Group, Inc., 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). Under these circumstances, the DIP Financing is warranted and should be approved by the Court.

    a)  <u>The Debtor Is Unable to Obtain Unsecured Credit</u>

To show that the credit required by the Debtor is not obtainable without granting junior liens and superpriority claims to the Lender, the Debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section

**10**

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Ames, 115 B.R. at 37-40 (debtor in possession must show that it has made a reasonable effort to seek other sources of financing under §364(a) and (b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088.

Here, this test is satisfied. The terms of the DIP Financing are favorable to the Debtor. Among other things, the interest rate is only 6% per annum and payable in kind, and the Lender has agreed to extend the DIP Financing despite the fact the Property is currently worth less than the Lender's secured loan because of the aforementioned unreasonable restrictions by the Golf Course Agreement. Such terms simply could not be obtained from a third party lender. Further, due to the turmoil in the credit markets, there is no independent source of DIP Financing for the Debtor, even on much more onerous terms.

b) The DIP Financing is Required to Preserve the Assets of the Estates

The DIP Financing is also required to preserve assets of the Estate. Without such financing, the Debtor cannot maintain the Property as required by the City of Las Vegas. Further, without the DIP Financing the Debtor will not be able to pay its Property taxes and insurance. Finally, a portion of the proceeds of the DIP Financing will be used to pay the professional fees generated by the Debtors' restructuring. If the DIP Financing is not approved, the Debtor may be unable to satisfy these expenses and may be unable to continue in chapter 11, assuring that the Debtor's creditors will receive little or no value on account of their claims.

c) The Terms of the DIP Financing are Fair and Reasonable

The terms of the DIP Loan are also fair and reasonable under the circumstances. As noted above, the 6% interest charged by the Lender is below market and interest will be paid in kind, preserving cash. Further, the liens and claims to be granted in connection with the DIP Financing will be added to the Lender's current secured loan, which side steps any issues concerning adequate protection. Indeed, the DIP Financing even could be seen as a form of adequate protection for the Lender since it will be used, in part, to fund maintenance, taxes and

**11**
**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION PURSUANT TO 11 U.S.C. § 364 AND BANKRUPTCY RULE 4001(C) FOR A FINAL ORDER**

insurance which will create rents constituting additional collateral for the Secured Lenders.

Finally, the DIP Financing is a clear indication that the Debtor, Aevitas, and Danny Modab, the majority owner of the Debtor, are prepared to stand by the Property and believes it can be successfully restructured. Put simply, the Debtor is putting its best foot forward in an effort to further its reorganization and the DIP Financing should be approved to permit that to occur.

## VI.

## CONCLUSION

For the forgoing reasons, the Debtors respectfully request that the Court enter an order granting the Motion.

**SCHWARTZ, FLANSBURG, PLLC**

DATED: June 22, 2016

_____
SAMUEL A. SCHWARTZ, ESQ.
ATTORNEYS FOR DEBTOR, AND DEBTOR-IN-POSSESSION, STONERIDGE PARKWAY, LLC

DATED: June 22, 2016              **ABBASI LAW CORPORATION**

_____
MATTHEW ABBASI, ESQ.,
ATTORNEYS FOR DEBTOR, AND DEBTOR-IN-POSSESSION, STONERIDGE PARKWAY, LLC
(Pro Hac Vice Approved)